UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

LISA ANN COLLINS,

        Plaintiff,

v.                             Case No.  5:17-cv-249-MJF

NANCY A. BERRYHILL,

        Defendant.

_____/

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa Ann Collins initiated this action under 42 U.S.C. § 405(g) to seek review of a final adverse decision of the Commissioner of the Social Security Administration. The Commissioner denied her Title II application for disability and disability insurance benefits and her Title XVI application for Supplemental Security Income. After careful consideration of the entire record, the decision of the Commissioner is affirmed.

## I.      Procedural History

On January 28, 2014, the Plaintiff protectively filed a Title II application for disability and disability insurance benefits and a Title XVI application for supplemental security income ("SSI"). (Tr. 22, 218-28). In her application, she alleged that her disability began May 1, 2013. (Tr. 22, 218-28). Her applications were denied initially on April 16, 2014, and upon reconsideration on August 15, 2014. (Tr. 22). Thereafter, she requested a hearing before an administrative law

judge ("ALJ"). On April 15, 2016, the ALJ conducted a video hearing. On July 28, 2016, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Social Security Act, from May 1, 2013, through the date of his decision. (Tr. 22-34). The Appeals Council denied Plaintiff's request for review. (Tr. 1-5). The decision of the ALJ, therefore, stands as the final decision of the Commissioner, subject to the review of this court. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007).

## II.     Findings of the ALJ

In denying Plaintiff's claims, the ALJ made the following findings relevant to the issues raised in this appeal:

(1)     The Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016.

(2)     The Plaintiff had not engaged in substantial gainful activity since May 1, 2013, the alleged onset date.

(3)     The Plaintiff suffered from the following severe impairments: degenerative disc disease, obstructive sleep apnea, morbid obesity, degenerative joint disease of the left knee, and affective mood disorder. Plaintiff's chronic obstructive pulmonary disease, diabetes mellitus, hypertension, liver issues, and fibromyalgia were found not to be severe impairments.

(4)     The Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(5)     The Plaintiff has the Residual Functional Capacity ("RFC") to perform light work except that the Plaintiff:

a. "can frequently handle with the right upper extremity" (Tr. 28);

b. must sit/stand every hour for ten minutes;

c. cannot climb ropes, ladders, or scaffolds, but can occasionally climb ramps and stairs, and balance, stoop, kneel, crouch, and crawl;

d. cannot have exposure to unprotected heights, open flames, open water, poorly ventilated areas, or chemical fumes;

e. cannot have concentrated exposure to vibrations or environmental irritants;

f. cannot operate a motor vehicle or moving machinery;

g. is limited to work that involves simple, routine and repetitive tasks that are performed in a work environment free of fast-paced work, and involves only simple work-related decisions and few, if any, workplace changes; and

h. is limited to work that entailed only occasional interaction with the public.

(6)     The Plaintiff is unable to perform any past relevant work.

(7)     The Plaintiff was 46 years old, which is defined as a "younger" individual on the alleged disability onset date.

(8)     The Plaintiff has a limited education and is able to communicate in English.

(9)     Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that Plaintiff is "not disabled" whether or not the Plaintiff has transferable job skills.

(10)    Considering the Plaintiff's age, education, work experience, and RFC, there are jobs in significant numbers in the national economy that the Plaintiff can perform.

(11)    The Plaintiff has not been under a disability, as defined in the Social Security Act, from May 1, 2013, through the date of the decision.

## III.   Standard of Review

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also Lewis v. Callahan*, 125

F.3d 1436, 1439 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if, in light of the record as a whole, the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); *Lewis*, 125 F.3d at 1439; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Lewis*, 125 F.3d at 1439. The reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)-(g),[1] the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, she is not disabled.

2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks disability insurance benefits ("DIB") or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims. *See* 20 C.F.R. §§ 404, 416. Therefore, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.    Plaintiff's Employment and Medical History

### A.    Relevant Medical History

On May 1, 2013, Plaintiff presented to Jackson Hospital and complained of knee pain. (Tr. 408). Diagnostic imaging showed that Plaintiff had osteophytes in

the knee area with marginal joint lipping. (Tr. 380). It also showed that a small separate ossification was projected at the superior aspect of the tibial tubercle. The impression was that Plaintiff likely had degenerative joint disease, most likely related to chronic or previous acute trauma, and a knee joint effusion or hemarthrosis. (Tr. 380). The treating provider's impression was arthritis, and the provider prescribed an Ace Wrap. (Tr. 411).

Plaintiff presented to the Family Care center on May 9, 2013. Claimant noted that she sometimes had pain in her left arm and shoulder and felt fluttering in her chest. An x-ray of her chest indicated that Plaintiff had bronchitis with chronic changes. The provider did not exclude the possibility of COPD. In a subsequent x-ray, the provider noted there were no changes from the prior test.

On May 15, 2013, Plaintiff went to Jackson Hospital with complaints of pressure-like episodes in her chest radiating to her left arm and fluttering in her chest. The treatment notes indicate that Plaintiff reported the biggest concern was the exercise intolerance as she normally walked one to two miles, three to four times a week, without the dyspnea she was experiencing. (Tr. 387). The physician noted that during the examination there were no audible wheels, rales, or rhonic. Plaintiff also had a normal heart rate and rhythm. Plaintiff did not present with any musculoskeletal deformities.

The physician admitted Plaintiff for further testing. A pulmonary angiogram indicated Plaintiff had cardiomegaly and bronchitis. (Tr. 395). A CT scan of Plaintiff's abdomen showed that Plaintiff had a fatty replaced liver parenchyma. It did not show evidence of hernias, obvious diverticulitis, or inflammatory process. (Tr. 394). An echocardiogram showed generally normal findings with some mild insufficiencies. A myocardial perfusion study was performed twice, and the impressions were of a normal study. (Tr. 396-98). Plaintiff was exercised per Bruce protocol, but the test was terminated due to fatigue and shortness of breath. (Tr. 391). The provider noted a mild hypertensive response and noted that the testing showed poor cardiovascular condition. But the test did not show evidence of reversible myocardial ischemia. Upon discharge, Plaintiff was advised she had type II diabetes. The discharge diagnose was "noncardiac chest pain, chronic obstructive pulmonary disease, morbid obesity, tobacco abuse, obstructive sleep apnea, hypertension, gastroesophageal reflux disease, depression, fibromyalgia, [and] adult-onset diabetes." (Tr. 385).

Plaintiff went to the Family Care Center several times in May 2013. Plaintiff was being treated for diabetes mellitus, obesity, tobacco abuse, anxiety attacks, hyperlipidemia, hypertension, degenerative joint disease of the left knee, and gastroesophageal reflux disease. (Tr. 452-54). In July 2013, Plaintiff was also being treated for fibromyalgia and obstructive sleep apnea by the Family Care Center

physicians. (Tr. 451). In September 2013, Plaintiff returned, and the physician added chronic dermatitis and carpal tunnel syndrome to the list of impressions. (Tr. 450). Plaintiff returned in January 2014, Plaintiff complained of rectal bleeding and she "was diagnosed with hepathomegaly (sic?)." (Tr. 31, 449). Plaintiff returned in March 2014, and she was treated for a skin lesion. (Tr. 447-48).

In April 2014, the record reflects continued treatment and a discussion regarding Plaintiff's diet. (Tr. 445, 622). In July 2014, the records indicate that liver testing was referred. (Tr. 31, 620). In October 2014, the Plaintiff presented to Family Care Center twice. According to the treatment notes from the first visit, the Plaintiff complained of peripheral neuropathy. (Tr. 31, 612). This does not appear in the assessment part of the treatment notes from the second October visit, however. (Tr. 31, 610).

In November and December 2014 and January 2015, treatment notes indicate Plaintiff had memory problems. (Tr. 604, 605, 609). In March 2015, the treatment notes reflect that memory problems were not assessed, but Plaintiff had knee pain. (Tr. 603). In February 2015, Plaintiff did not complain of either memory problems or knee pain. (Tr. 602). Plaintiff continued to seek care from the Family Care Center on a monthly basis and the last record is from March 17, 2016. (Tr. 31, 588-601). The ALJ noted that the treatment notes from some visits mention knee pain. (Tr. 31). At least one record notes abdominal pain. Treatment records from 2016 show that

Plaintiff complained of lower quadrant pain, hand pain, and peripheral neuropathy. (Tr. 31).

On April 12, 2015, Plaintiff presented at Tallahassee Orthopedic Clinic. Plaintiff alleged that she had moderate knee pain, which was present for approximately 4 years. Plaintiff reported that she had been using topical Voltaren gel as prescribed by her primary care physician (Tr. 584). The result of the left knee examination showed there was no swelling, ecchymosis, or deformity. (Tr. 585). Plaintiff's gait was normal with no limp. The provider advised Plaintiff of the underlying pathology, discussed nonsurgical versus surgical intervention, and prescribed physical therapy and continued used of Voltaren gel. (Tr. 586).

Medical records from the Digestive Disease Center noted that claimant had a colonoscopy and EGD on August 25, 2014. The tests did not show polyps or the source of anemia or bleeding. (Tr. 629). On January 30, 2015, Plaintiff swallowed a PillCam that was retrieved on February 2, 2015. The results showed that there were no small bowel abnormalities, but there was significant active bleeding in the colon. (Tr. 629). A follow-up colonoscopy showed a tubular adenoma with no evidence of malignancy. (Tr. 630).

Claimant also submitted records from the NeuroPain Center, where Plaintiff was seen by Dr. George Barrio, M.D. There is only one record from a visit on April 14, 2016, the day prior to the hearing. The Plaintiff complained of non-restorative

sleep, excessive daytime sleepiness, and night awakening in which she was gasping for air. (Tr. 624). The treatment record indicates that Plaintiff did not have "any workup" for neuropathy and she had not undergone a sleep study. (Tr. 624). Upon examination, the Plaintiff was noted to have decreased vibratory sensation in her feet, but she had normal heel/toe walk and a normal tandem walk. (Tr. 626). Additionally, the claimant had 5/5 strength in all groups tested with normal muscle tone. She appeared to have an intact memory—both recent and remote—and the record reflects that Plaintiff was able to recall three out of three objects at 5 and 10 minutes. (Tr. 626). Her attention span and concertation were also noted as good. Dr. Barrio ordered x-rays and a sleep study, but Plaintiff did not submit any additional records from Dr. Barrio. (Tr. 32, 626-27).

Turning to Plaintiff's mental health history, Plaintiff presented as a self-referral to Florida Therapy Services in April 2014. She reported problems with depression, anxiety, PTSD, and a history of abuse. (Tr. 557-65).

On April 25, 2014, Dr. Michael Vandewalle, D.O., conducted an initial psychiatric evaluation. (Tr. 25, 556). Dr. Vandewalle's notes describe the claimant as alert and cooperative with clear, coherent, and articulate speech. Dr. Vandewalle noted that Plaintiff's memory was intact, her insight and judgment were fair, and she did not have any suicidal ideations. Plaintiff's mood and affect were appropriate to the situation, and her thoughts were clear and coherent with no evidence of

psychosis. Dr. Vandewalle diagnosed the Plaintiff with major depression and panic disorder without agoraphobia. Dr. Vandewalle assessed the Plaintiff as having a Global Assessment of Functioning ("GAF") score of 55. (Tr. 556).

Plaintiff returned on May 20, 2014, and reported difficulty getting to sleep. (Tr. 554). The record indicates that Plaintiff's memory was intact, her concentration was good, her affect was congruent, and her mood was good. (Tr. 554). In August 2014, Plaintiff still reported experiencing some anxiety, but the results from the mental health exam had many of the same findings contained in Dr. Vandewalle's initial assessment. (Tr. 26, 551-52). In October 2014, Plaintiff reported that she was doing fair. (Tr. 26, 548). Plaintiff appeared to be in a good mood, had rational thought and speech processes, and she possessed an intact memory and good concentration. (Tr. 549). Plaintiff returned in December 2014, January 2015, and March 2015. (Tr. 26, 539-41, 542-44, 545-47). Records for these visits indicated that Plaintiff reported that she was doing fair. (Tr. 539, 542, 545). Similarly, these records indicated that she had good mood, rational thought and speech processes, intact memory, and good concentration. (Tr. 540, 543, 546).

On May 11, 2015, Plaintiff had an annual assessment. (Tr. 529-38). Plaintiff reported progress with her coping skills, but she reported that she still suffered from daily depression and anxiety. (Tr. 530). Plaintiff reported no substance abuse since her last assessment. (Tr. 532-33). The treating provider noted that Plaintiff had a

blunted affect, but was fully oriented, had good abstract reasoning, a good sense of responsibility, and exhibited rational and logical thought processes. (Tr. 535). Additionally, it was noted that her memory appeared intact. (Tr. 534). Plaintiff's diagnoses were posttraumatic stress disorder, major depressive disorder, and panic disorder. (Tr. 536).

Plaintiff returned for medication management in June 2015 and July 2015. (Tr. 523-25, 526-28). Plaintiff reported doing "ok on the meds." (Tr. 527). Records for these visits note the Plaintiff's medications and her reported symptoms. (523-25, 526-28). They also note that Plaintiff's concentration was "good" and her memory was intact. (Tr. 524, 527). The treatment provider also noted that Plaintiff's affect was congruent and that her speech and thought processes were rational. (Tr. 524, 527).

In July 2015, Plaintiff presented voluntarily at Emerald Coast Behavioral Hospital. Plaintiff reported having suicidal ideations. Dr. Yana Kirova-Pancheva, M.D., examined the Plaintiff and noted that she could not elicit PTSD symptoms or general anxiety disorder symptoms. (Tr. 26, 580). Upon discharge, the Plaintiff was psychiatrically stable. The records note that she had a depressed mood, but her affect was within a normal range. (Tr. 582). Additionally, her memory was intact, and she had fair judgment and insight. (Tr. 582).

In October 2015, Plaintiff returned to Florida Therapy Services. Plaintiff reported a worsening of her symptoms. (Tr. 519). The treating provider noted that she had a congruent affect, rational thought processes, and normal perceptions. (Tr. 520). Plaintiff also was noted to have an impaired memory and limited concentration; however, no support was included for this assessment. (Tr. 27, 521). Plaintiff returned in November 2015, and the mental status exam results remained the same. (Tr. 517). Plaintiff reported that some medication was causing nightmares and nausea. (Tr. 27, 515). In December 2015, Plaintiff returned and noted that she was irritated by everything. (Tr. 512). There were no mental status exam results contained in the record.

Plaintiff's last medical record from Florida Therapy Services is dated February 2016. Plaintiff reported that she was doing okay, but she did not feel like doing anything. (Tr. 508). She noted that she had unexplained weight loss, her diabetes appeared to be out of control, and she was having vision problems due to her diabetes. (Tr. 508). Plaintiff complained of frequent urination as a result of diabetes and frequent drinking, abdominal pain, joint pain, and gait disturbance. (Tr. 509). As for mental health findings, the provider noted that Plaintiff's affect was congruent but restricted, thought and speech processes were rational, and her memory and concentration were impaired and limited. (Tr. 510).

Plaintiff also was examined by a state agency disability examiner and state agency medical consultant. Both reviewers found that Plaintiff could perform light work. She was also reviewed by psychological reviewers, who found that there was no evidence of severe impairments. (Tr. 33). In May 2014, a consultative examiner Julian Salina, Ph.D., also saw the Plaintiff. (Tr. 33, 495-98).

Plaintiff submitted to the Appeals Council a Mental Health Evaluation completed by Dr. Vandewalle and Nurse Hussey. This report was created on April 25, 2017, approximately nine months after the ALJ's decision. In the Mental Health Evaluation, Dr. Vandewalle and Nurse Hussey opined that:

- Plaintiff was "limited but satisfactory" to "seriously limited" in her mental abilities and aptitudes to do unskilled work.

- Plaintiff was seriously limited in her mental abilities and aptitudes needed to do semiskilled and skilled work.

- Plaintiff was unable to perform work at a consistent pace without rest periods of an unreasonable number and length.

- Plaintiff was limited in her ability to interact appropriately with the general public.

- Plaintiff had marked limitations in her daily living activities, social functioning, and ability to maintain concentration, persistence, or pace.

- Within a twelve-month period, Plaintiff experienced one to two episodes of decompensation of extended duration.

- A minimal increase in mental demands or change in environment likely would cause Plaintiff to decompensate.

- Plaintiff was unable to function independently outside her home.

- Plaintiff's impairment would cause her to be absent from work more than four days per month.

(Tr. 635-40).

The Appeals Council denied review. In its decision, the Appeals Council noted that it applied the rule that the Appeals Council would review the case if claimant provided additional evidence that "is new, material, and relates to the period on or before the date of the hearing decision" and shows that "there is a reasonable probability that the additional evidence would change the outcome of the decision." (Tr. 1, 2). The Appeals Council noted that it received the Mental Impairment Questionnaire and concluded that "this evidence does not show a reasonable probability that it would change the outcome of the decision." (Tr. 2).

### B. <u>Relevant Hearing Testimony</u>

At her hearing, Plaintiff testified that she suffered from fibromyalgia, carpal tunnel syndrome, and neuropathy. (Tr. 50-54). Plaintiff testified that a physician from Bonifay, Florida—whose name she could not remember—conducted diagnostic testing for fibromyalgia. (Tr. 51). Plaintiff could not discern whether her pain was derived from the fibromyalgia or her neuropathy, but she asserted that she suffered from this pain about two to three times per month. (Tr. 52). She noted that she had been tested for carpal tunnel syndrome, but that the records regarding the test could not be found. She noted that her right hand was worse than her left. (Tr.

54). She also testified that she could only sit for eight hours in a recliner and that she did not think she could walk for more than 20 minutes. (Tr. 57, 58, 67). In particular, she noted that when she went to the store with her daughter, she often had to use a motorized cart. (Tr. 57). Plaintiff noted that the issue was her knee, but that when she went to the Tallahassee Orthopedic Center, the physicians did not think "it was a big enough issue." (Tr. 69). She noted that she had difficulty picking up her grandchildren, who weighed about twenty pounds. (Tr. 59).

Additionally, she noted that, because of her diverticulitis, she frequently would have to use the bathroom and it caused her to be anemic. (Tr. 60, 69, 70). She testified that she was diagnosed with sleep apnea and that she was going to be tested to confirm sleep apnea. (Tr. 60). She stated that she had not "done" drugs for approximately one year. (Tr. 61, 64). She also noted that she suffered from upper and lower gastrointestinal problems and that she had polyps. She related that her digestive issues made her anemic. (Tr. 66). She also testified that she was taking medication for her depression and anxiety, but that she still had mental health issues. She explained that "some days are worse than others." (Tr. 71).

With regard to her concentration and memory problems, the Plaintiff noted that she did not have difficulty with her previous cleaning or janitorial work. She noted that in the fast food industry, she would have to be reminded a few times about her duties, so she could "get the hang of it." (Tr. 63).

A vocational expert ("VE") also testified at the hearing and responded to three hypothetical questions posed by the ALJ. The ALJ first asked the VE to consider an individual who (1) is limited to light work with a sit/stand option every ten minutes; (2) cannot climb ladders, ropes or scaffolding; (3) can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl; and (4) could not be exposed to unprotected heights, open flames, open waters, motor vehicles or machinery, concentrated exposure to vibration, and no concentrated exposure to environmental irritants, fumes, odors, dust, gases, poorly ventilated areas, and chemical fumes. (Tr. 72). The VE testified that such limitations would prevent such an individual from performing the Plaintiff's previous job, but it would not preclude the performance of other jobs. The VE identified three types of available jobs: (1) office clerk; (2) inspector, tester, or sorter; and (3) receptionist. (Tr. 73).

The ALJ next asked the VE to consider an individual with the same limitations as the first hypothetical and additional limitations in the individual's right upper extremity as well as mental abilities. The VE testified that the additional limitations would eliminate the receptionist job and the inspector, tester, sorter job. The VE testified that the possibility of working as a clerk would remain. (Tr. 73). The ALJ then asked the VE to consider all the previous limitations and the additional limitation that the individual would miss work one day per week on average. The

VE testified that this would eliminate all work because such an individual would not be able to complete a 40-hour workweek. (Tr. 74).

### C.    **Plaintiff's Past Employment History**

Based on Plaintiff's prior employment history, the ALJ found that the only relevant past employment was categorized as "cleaner." (Tr. 33, 48-49). The VE categorized this position at a light, unskilled level. (Tr. 33).

## V.    **Discussion**

Plaintiff raises three issues on appeal. Specifically, Plaintiff alleges that reversal and remand are required because, in reaching his decision: (1) the ALJ failed to consider the aggregate impact of Plaintiff's severe impairments, including her obesity; (2) the ALJ erroneously evaluated Plaintiff's testimony regarding her symptoms and limitations; and (3) the Appeals Council erroneously found that additional evidence submitted for the first time before the Appeals Council "did not show a reasonable probability that it would change the outcome of the [ALJ's] decision." (Doc. 16 at 1).

### A.    **Aggregate Impact of Plaintiff's Conditions**

Plaintiff argues that her case should be remanded because the ALJ failed to take into account the aggregate impact of Plaintiff's conditions, including her obesity, diverticulitis, and other "non-severe" impairments.

### 1.    *Obesity*

An ALJ is not required to address an alleged impairment when the claimant and her attorney failed to raise the issue in the application for disability or at the hearing. *See Sullivan v. Comm'r of Soc. Sec.*, 694 F. App'x 670, 671 (11th Cir. 2017) (holding Plaintiff, who was represented by counsel, could not meet her burden to prove she was disabled on the basis of an  impairment that was not raised in the application for benefits and not offered at the hearing as a basis for disability); *Robinson v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010) (holding that the ALJ had no duty to consider the claimant's chronic fatigue syndrome diagnosis where claimant was represented by counsel and counsel did not raise this issue at the hearing) (citing *Pena v. Charter*, 76 F.3d 906, 909 (8th Cir. 1996)). An "administrative law judge is under no obligation to investigate a claim not presented at the time of the applicant for benefits and not offered at the hearing as a basis for disability." *Street v Barnhart*, 133 F. App'x. 621, 627 (11th Cir. 2005) (quoting *Pena*, 76 F.3d at 909).

Here, Plaintiff was represented by counsel, and neither counsel nor Plaintiff raised obesity as a disabling condition in her disability reports (Tr. 253, 318, 330), or at the hearing (Tr. 41-75). Indeed, in Plaintiff's application for benefits she listed only the following impairments: (1) three bulging discs; (2) fibromyalgia; (3) depression; (4) HBP; (5) diabetes; (6) an enlarged liver; (7) sleep apnea; (8) spurs in

left knee; (9) memory problems; (10) anxiety; and (11) a stomach ulcer. (Tr. 253).

At the hearing, the only discussion regarding Plaintiff's obesity was brief questioning by the ALJ. (Tr. 58-59). The ALJ noted that the record reflected that Plaintiff might be obese, and questioned the Plaintiff:

> ALJ: There is also a suggestion of obesity. Do you know how much you weigh at this point?
>
> Plaintiff: 310 pounds
>
> ALJ: You lost some weight in the last year, right? You were up to 324?
>
> Plaintiff: Yeah. I teeter between 310 and under 300, like 290. It just goes up and down.
>
> ALJ: And you're 5'6''?
>
> Plaintiff: 5'7''
>
> ALJ: You're 5'7''
>
> Plaintiff: Yes.

(Tr. 58-59). That was the extent of the testimony about the Plaintiff's obesity. Thus, during her hearing, neither Plaintiff nor her counsel indicated that Plaintiff's obesity caused her any functional limitations.

Although the ALJ was not required to consider the Plaintiff's obesity, he clearly evaluated her obesity, as he found it to be a severe impairment. (Tr. 24). The ALJ then properly evaluated the Plaintiff's obesity in assessing her RFC. (Tr. 28, 29). The record reflects that the ALJ considered Plaintiff's medical records from

2013 through 2016. (Tr. 29-32). Although these records mention Plaintiff's obesity[2], these records do not indicate any functional limitations. (Tr. 385, 387, 388, 404, 445, 448, 450, 451, 453, 479-80, 483, 490, 508, 512, 515, 523, 526, 539, 542, 548, 570, 574, 581, 582, 585, 589, 591, 592, 593, 597, 598, 599, 600, 602, 604, 609, 610, 617, 622, 625).

In addition, the ALJ reviewed the Disability Determination Services ("DDS") decision (both the initial DDS report and the reconsideration determination). (Tr. 131). To the extent Plaintiff alleges that the ALJ erred in assigning some weight to these decisions, the court finds that, at most, the ALJ's decision to assign some weight amounts to nothing more than harmless error. The ALJ's decision thoroughly evaluated all of Plaintiff's objective medical records. (Tr. 28-33). The ALJ only referred to the initial DDS report and the state agency medical consultant in one sentence: "As for opinion evidence, some weight is given to the DDS medical reviewers as they also assessed a range of light work." (Tr. 33). Thus, the ALJ's decision that Plaintiff had an RFC to perform light work was primarily based on the medical evidence in the record. (Tr. 29-32).

---

[2] Although some of Plaintiff's medical records do not use the term "obesity," Plaintiff's weight on these occasions were similar to Plaintiff's weight at the time of hearing, which the ALJ noted was indicative of "a body habitus consistent with a finding of medical obesity." (Tr. 29).

The ALJ found that the DDS report and reconsideration determination merely confirmed the objective evidence. (Tr. 33). There was nothing erroneous or improper about drawing such a conclusion. *See Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 265-66 (11th Cir. 2009) (finding that there was no error when the ALJ referenced the DDS report, which merely confirmed the objective medical evidence, and noting that "to the extent that one could argue that the ALJ erred, the error would not rise above the level of harmless error."); *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013) (stating that "although, the ALJ mistakenly referred to the SDM as a doctor and should not have given any weight to her opinion because she was merely an SDM, any error in regard was harmless because the ALJ stated that he considered all of the evidence in the record . . . and there is nothing to indicate that the opinion of the SDM was anything more than cumulative of other evidence, let alone dispositive").

Indeed, the assessment by Dr. Minal Krishnamurthy—a state agency medical consultant—is one of the few records that provided the ALJ with any mention of functional limitations regarding Plaintiff's obesity. (Tr. 131, 132). Despite a finding of morbid obesity, Dr. Krishnamurthy found that the Plaintiff was able to perform work at an exertional level consistent with light work, except with certain postural

limitations and environmental limitations.[3] The ALJ's determination of Plaintiff's RFC included these same postural and environmental limitations, which indicates that the ALJ took Plaintiff's obesity into account in assessing the Plaintiff's residual functional capacity. (Tr. 28, 131, 132).

Taken as a whole, the record shows that the ALJ properly evaluated the Plaintiff's obesity. Indeed, the ALJ found that the Plaintiff's obesity was a severe impairment, but also concluded that the Plaintiff had the residual functional capacity to perform light work. (Tr. 24); *see Lewis v. Comm'r of Soc. Sec.*, 487 F. App'x. 481, 483 (11th Cir. 2012) (holding that the ALJ properly evaluated claimant's obesity in accordance with SSR 02-1p where the ALJ determined claimant's obesity was a severe impairment but did not meet or equal a listing and then considered claimant's obesity in assessing the RFC); *Castel*, 355 F. App'x at 264.

Further, although the ALJ did not explicitly state this in his decision, the Plaintiff's weight after her alleged onset was often similar to her weight before her alleged onset date when she worked as a cleaner in 2013, which the VE testified was categorized as light work.[4] (Tr. 72, 254; compare e.g., Tr. 371, 374, 415, 439 with

---

[3] Dr. Krishnamurthy stated that the Plaintiff's environmental limitations were also due to her degenerative disc disease and obstructive sleep apnea. (Tr. 132). Dr. Krishnamurthy also explained that the postural limitations were due to Plaintiff's obstructive sleep apnea and fibromyalgia. (Tr. 131).

[4] Although neither party raised this issue in their briefs, the court notes that at the hearing the VE testified that the job of cleaner was "light and unskilled" (Tr. 72),

Tr. 512, 526, 539, 542, 545, 548, 551, 589, 590, 591, 592, 593, 594). Accordingly, Plaintiff's ability to perform her work at a substantially similar weight supports the ALJ's finding that obesity did not substantially affect her residual functional capacity to perform light work after the alleged onset date. *See Castel*, 355 F. App'x. at 264 n.9; *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005); *Ellison v. Barnhart*, 355 F.3d 1272, 1275-76 (11th Cir. 2003).

Thus, the record indicates that the ALJ properly considered the Plaintiff's obesity as a severe impairment and the aggregate impact of this condition on her RFC. Accordingly, Plaintiff has failed to establish any error in the ALJ's determination regarding her obesity.

### 2. *Diverticulitis*

Plaintiff also alleges that the ALJ failed to evaluate Plaintiff's impairment of diverticulitis and her other digestive issues in his decision.

At step two of the analysis, the ALJ must consider whether the claimant has a severe impairment or combination of impairments. 20 C.F.R. § 404.1520; *Winschel*

---

but in the ALJ's decision the ALJ categorized the job as "medium and unskilled." (Tr. 33). The regulations define medium work as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c). Assuming that the Plaintiff's previous job was properly categorized as "medium exertion," this would also indicate that the ALJ acknowledged that Plaintiff's obesity—in addition to other impairments—restricted Plaintiff to only light work rather than medium work.

*v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011); *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). If the ALJ concludes that the claimant's alleged impairment or combination of impairments are not severe, the ALJ must end the analysis and find that the claimant is "not disabled." 20 C.F.R. § 404.1520; *see Jamison*, 814 F.2d at 588 (Step two "acts as a filter; if no severe impairment is shown the claim is denied"); *McDaniels v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986) (holding that step two is a threshold inquiry, which allows "only claims based on the most trivial impairments to be rejected").

To proceed to step three, the ALJ need only identify one severe impairment. *See Flemming v. Comm'r of the Soc. Sec. Admin.*, 635 F. App'x 673, 675 ("The finding of 'any severe impairment' is sufficient for the ALJ to proceed to the third step."); *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014) ("[I]t is apparent that there is no need for an ALJ to identify every severe impairment at step two."); *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824-25 (11th Cir. 2010); *Jamison*, 814 F.2d at 588 (noting that the ALJ correctly identified at least one severe impairment and correctly proceeded to step three). So long as the ALJ provides that he has taken all of Plaintiff's impairments into consideration when determining the Plaintiff's capacity to work at steps three and beyond, any omission during step two is of no consequence. *Tuggerson-Brown*, 572 F. App'x at 951-52; *Perry v. Astrue*, 280 F. App'x 887, 893-94 (11th Cir. 2008).

Even if the ALJ did not discuss all of Plaintiff's conditions (including her diverticulitis and digestive issues) at step two of the sequential process, it made no difference insofar as the ALJ ruled in Plaintiff's favor at step two. (Tr. 24). The ALJ found that the evidence supported the conclusion that the Plaintiff suffered from at least five severe impairments: (1) degenerative disc disease; (2) obstructive sleep apnea; (3) morbid obesity; (4) degenerative joint disease of the left knee; and (5) affective mood disorder. (Tr. 24). The ALJ then correctly proceeded to step three of the analysis. (Tr. 27). Thus, even assuming that Plaintiff's diverticulitis or digestive issues are "severe," the ALJ's recognition of this condition would not have altered the step two analysis. *See Flemming*, 635 F. App'x at 675; *Tuggerson-Brown*, 572 F. App'x at 951-52. Plaintiff, therefore, has failed to establish that the ALJ committed error at step two of the analysis.

Additionally, the Plaintiff has failed to show that the ALJ erred in evaluating Plaintiff's diverticulitis and digestive issues. Under the regulations, a disability is determined by the extent to which a claimant's ability to work is *limited* by an impairment, not the fact that she suffers from a number of medical conditions. *See Russel v. Astrue*, 331 F. App'x. 678, 681 (11th Cir. 2009) (rejecting a claim where the plaintiff asserted that her high blood pressure caused her to be disabled but failed to point to any documentation in her medical records demonstrating how it might cause disability); *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005)

(holding that the mere existence of impairments does not reveal the extent to which they limit the claimant's ability to work or undermine the ALJ's determination in that regard); *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) (holding that the severity of an impairment "must be measured in terms of its effect upon the ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality"). A mere diagnosis is not enough to establish a disability.

In the present case, Plaintiff's medical records do not reflect that the diverticulitis or digestive issues caused the Plaintiff any *work-related limitations*. (Tr. 629-30). To the extent Plaintiff relies on the diagnosis of diverticulitis as a basis for concluding she has a disability, the Plaintiff fails to establish the ALJ erred in evaluating this impairment.

Additionally, the record reflects that the ALJ fully considered the Plaintiff's diverticulitis and digestive issues in the later steps of the analysis. (Tr. 30-32). The Eleventh Circuit has held that an ALJ's statement that he reviewed the entire record and found that the claimant "did not have an impairment or combination of impairments" that equaled a listing after consideration of the impairments, is "sufficient to demonstrate that the ALJ considered the cumulative effect of the applicant's impairments." *Tuggerson-Brown*, 572 F. App'x at 951 (citing *Wilson*,

284 F.3d at 1224-25; *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991)).

Here, the ALJ noted that "after careful consideration of the *entire record*," he found that the Plaintiff had the RFC to perform light work with additional limitations. (Tr. 28) (emphasis added). The ALJ then discussed the evidence regarding Plaintiff's diverticulitis and digestive issues further in his analysis. (Tr. 30-32). Specifically, the ALJ noted that, on May 15, 2013, Plaintiff's abdominal and pelvic CT scan showed "no obvious diverticulitis or inflammatory process." (Tr. 30, 394). Additionally, the ALJ noted that in January 2014, she went to her physician and presented with rectal bleeding and "was diagnosed with hepathomegaly (sic?)." (Tr. 31, 449). He also referenced treatment records from the Digestive Disease Center. The records from the August 2014 visit indicated that Plaintiff had polyps, but did not show a source of anemia or bleeding. (Tr. 629).

The records from Plaintiff's January 2015 visit showed active bleeding in the colon. But there were no small bowel abnormalities identified. (Tr. 629). Plaintiff underwent a colonoscopy which showed a tubular adenoma with no evidence of malignancy. (Tr. 630). The ALJ also considered Plaintiff's testimony that she had upper and lower gastrointestinal problems, polyps, and other issues with her intestines that made her anemic. She also testified that she had hemorrhoids and underwent surgery.

It is clear from the ALJ's thorough discussion regarding the medical evidence that he considered the *entire* record, and the ALJ specifically considered Plaintiff's diverticulitis in his determination of Plaintiff's residual functional capacity and his decision that Plaintiff was not disabled. *See Tuggerson-Brown*, 572 F. App'x at 951 (citing *Wilson*, 284 F.3d at 1224-25; *Jones*, 941 F.2d at 1533).

### 3.    *Non-severe Impairments*

Plaintiff also argues that the ALJ's decision was erroneous because the ALJ did not consider the impact of any of the Plaintiff's non-severe impairments in determining the aggregate impact of her medically-determinable impairments.

An ALJ must consider all impairments, "regardless of severity, in conjunction with one another in performing the latter steps of the sequential evaluation." *Tuggerson-Brown*, 572 F. App'x at 951; *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990). As noted above, the Eleventh Circuit has held that an ALJ's statement that he reviewed the entire record and found that the claimant "did not have an impairment or combination of impairments" that equaled a listing after consideration of the impairments, is "sufficient to demonstrate that the ALJ considered the cumulative effect of the applicant's impairments." *Tuggerson-Brown*, 572 F. App'x at 951 (citing *Wilson*, 284 F.3d at 1224-25; *Jones*, 941 F.2d at 1533).

In his decision, the ALJ found that the Plaintiff's "medical conditions of chronic obstructive pulmonary disease, diabetes mellitus, hypertension, liver issues,

and fibromyalgia" were non-severe impairments. (Tr. 25). But he noted that "consistent with 20 CFR 404/1545 and 416.945 the relevant symptoms from the medically determinable impairments have been considered in the residual functional capacity." (Tr. 25). Indeed, the ALJ stated that his determination of the Plaintiff's RFC occurred only "after careful consideration of the *entire record*." (Tr. 28). The ALJ went beyond these mere statements in his opinion and discussed the Plaintiff's chronic obstructive pulmonary disease (Tr. 30-31), diabetes mellitus (Tr. 30, 31, 32, 33), hypertension (Tr. 27, 30, 31), liver issues (Tr. 30, 31, 33), and fibromyalgia (Tr. 30, 31). The ALJ also discussed Plaintiff's severe impairments including sleep apnea (Tr. 31, 33), morbid obesity (Tr. 29), and degenerative joint disease of the left knee (Tr. 29, 31, 32, 33). Thus, it is clear from the record that the ALJ properly considered the severe and non-severe impairments in his determination that the Plaintiff was not disabled.

## B.     Evaluation of Plaintiff's Subjective Complaints

Plaintiff next argues that the ALJ did not properly evaluate the Plaintiff's subjective complaints regarding the intensity, persistence, and limiting effects of the Plaintiff's symptoms.

Section 416.929 provides in part that in determining whether a claimant is disabled, the commissioner should consider all the plaintiff's symptoms, "including pain, and the extent to which [her] symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence." 20 C.F.R §

416.929. The Eleventh Circuit had adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1)
> there must be objective medical evidence to confirm the severity of the
> alleged pain arising from the condition or (2) the objectively
> determined medical condition must be of severity which can reasonably
> be expected to give rise to the alleged pain.

*Hand v. Heckler*, 761 F.2d 1545, 1549 (11th Cir. 1986); *see also Wilson*, 284 F.3d

at 1225.

"[B]oth the regulations and the eleventh circuit's standard require objective

medical evidence of a condition that could be expected to cause the pain alleged, but

neither requires objective proof of pain itself." *Elam*, 921 F.2d at 1216. The Eleventh

Circuit has held that "[p]ain alone can be disabling, even when its existence is

unsupported by objective evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th

Cir. 1992) (citing *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987)). The

absence of evidence to support a claim of severity is a factor that can be considered

by ALJs, however. *Id.*; *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).

Notably, "[i]f proof of disability is based upon subjective evidence and a

credibility determination is, therefore, crucial to the decision, the ALJ must either

explicitly discredit such testimony or the implication must be so clear as to amount

to a specific credibility finding." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir.

1995) (citation and quotation marks omitted); *MacGregor*, 786 F.2d at 1054 ("If the

Commissioner refuses to credit" the subjective testimony of the Plaintiff concerning pain "he must do so explicitly and give reasons for that decision. . . . Where he fails to do so we hold as a matter of law that he has accepted the testimony as true." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The reasons articulated by the ALJ must be based upon substantial evidence. *Jones*, 941 F.2d at 1532.

In the present case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 29). But the ALJ concluded that the Plaintiff's subjective testimony—regarding the intensity, persistence, and limiting effects of her symptoms—was not entirely consistent with the medical evidence. (Tr. 29). In particular, the ALJ observed that "in reviewing the evidence, [he] noted inconsistencies between the medical records and the claimant's alleged degree of symptoms." (Tr. 29). The ALJ noted that Plaintiff claimed that she frequently remained in a chair due to knee pain, but the medical records did not show ongoing treatment for knee pain. In addition, the ALJ noted that the Plaintiff stated that she could go grocery shopping and she apparently drove herself insofar as many of her medical records noted she was unaccompanied.

In determining that Plaintiff's testimony was not entirely supported by the evidence, the ALJ properly relied on the history of Plaintiff's treatment for her knee condition. The ALJ discussed that the conservative medical treatment— which consisted of physical therapy, application of Voltaren gel, and an Ace

Wrap—was inconsistent with her claim of severe knee pain. (Tr. 29, 32, 411, 586). An ALJ is permitted to consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996); *Pennington v. Comm'r of Soc. Sec.*, 652 F. App'x. 862, 873 (11th Cir. 2016) (same); *Carson v. Comm'r of Soc. Sec.*, 440 F. App'x 863, 865 (11th Cir. 2011) (holding that the ALJ had substantial evidence to conclude that claimant's pain was not as severe as she claimed because the claimant "followed a conservative treatment plan directed by his treating physicians"); *Miller v. Astrue*, No. 8:07-cv-2074, 2009 WL 35167, at *5 (M.D. Fla. Jan. 6, 2009) (same).

Plaintiff argues that reliance on the conservative treatment that Plaintiff received is erroneous because Social Security Ruling ("SSR") 16-3p specifically states that an ALJ must consider reasons why the Plaintiff may not comply with a physician's prescribed treatment plan or seek treatment consistent with the degree of his or her complaints. Social Security Ruling 16-3p, 81 Fed. Reg. 14166, 2016 WL 1119029 (Mar. 28, 2016). The ALJ stated that he had carefully considered the "record as a whole" and during the hearing, Plaintiff stated that she had sought treatment at the Tallahassee Orthopedic Center. (Tr. 28, 61). Plaintiff noted that the Tallahassee Orthopedic Center physicians told that her knee pain was "not serious enough." (Tr. 62).

The treatment record from the Tallahassee Orthopedic Center notes that surgery was discussed with Plaintiff, but a conservative treatment option was chosen, and even a cortisone injection was deferred. (Tr. 586); *see* S.S.R. 16-3p, 2016 WL 1119029 (noting that an ALJ can consider whether "[a] medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual."). Plaintiff also indicated that she had insurance coverage, and medical records from the relevant time indicate that the Plaintiff had stated that she struggled financially, but that she also was able to obtain and use drugs. (Tr. 26, 56); *see* S.S.R. 16-3p, 2016 WL 1119029 (noting that an ALJ can consider whether "an individual may not be able to afford treatment and may not have access to free or low-cost medical services"). Furthermore, this was not the sole reason for denying Plaintiff's benefits.

The ALJ noted that, despite several years of medical treatment records and the fact that the Plaintiff frequently sought treatment for her various medical conditions, medical personnel addressed her knee pain on only a few occasions. (Tr. 451, 452, 454, 584, 592, 599, 600, 601, 603). In only a few of those instances was the knee pain listed as the Plaintiff's chief complaint. (Tr. 411, 586). Additionally, it appears that Plaintiff's primary care physician prescribed the use of Voltaren gel as treatment for the knee pain. (Tr. 584).

Additional objective findings were also inconsistent with Plaintiff's complaint. For instance, on the alleged onset date of her disability, the Plaintiff indicated that the knee pain was "moderate" (Tr. 408-14). Even into mid-2015, Plaintiff noted that the knee pain was moderate. (Tr. 584). Diagnostic testing showed mild to moderate left knee arthritis. (Tr. 411, 414). In subsequent evaluations, diagnostic testing showed that there was mild to moderate "medial and will [sic?] femoral compartment OA with marginal spurring", and treatment notes indicated that there was no swelling, ecchymosis, or deformity. (Tr. 585, 586). In mid-2015, her gait pattern was normal with no limp. (Tr. 585). She also appeared to have normal heel-toe and tandem walking according to the treatment record from the NeuroPain Center, and she denied having an unsteady gait. (Tr. 625, 626). Thus, the objective medical findings alone—which also were consistent with the conservative nature of the treatment of Plaintiff's knee—provided substantial evidence to support the ALJ's conclusion that Plaintiff's pain was not as severe as Plaintiff alleged.

Plaintiff also argues that the ALJ improperly relied on Plaintiff's daily activities in discrediting her testimony regarding the pain. An ALJ may properly consider a claimant's activities in his determination that the Plaintiff's symptoms are not as limiting as alleged. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Moore*, 405 F.3d at 1213. The ALJ noted that in addition to the inconsistencies between the

objective medical evidence and Plaintiff's claims, evidence of Plaintiff's daily activities—including shopping and being able to drive—undermined Plaintiff's allegation of relative immobility.

The report completed by consultative examiner Dr. Salina noted that Plaintiff drove a motor vehicle. (Tr. 496). Plaintiff's daughter also reported that Plaintiff "'can' drive but is carless." (Tr. 264). Plaintiff's daughter also noted that when the Plaintiff goes out, the Plaintiff is able to go alone. (Tr. 264). The Plaintiff confirmed this. (Tr. 293). Thus, there is substantial evidence that Plaintiff was capable of driving and did in fact drive. To the extent Plaintiff claims that this finding was inconsistent with the ALJ's decision that Plaintiff's RFC should contain a limitation on driving, this amounts only to harmless error. *See Cooper v. Astrue*, 373 F. App'x. 961, 962 (11th Cir. 2010) (citing *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983)) (stating that an error may be harmless when it does not prejudice a claimant"). The ALJ also noted that Plaintiff could shop for groceries. While Plaintiff argues that some records indicate that she was required to use a motorized shopping cart or sent others to shop, the record shows that she reported that she could cook, manage her own money, perform household chores, care for herself, and shop for food. (Tr. 263, 264-65, 281, 293 496, 501).

Taking the record as a whole, the ALJ's decision regarding Plaintiff's subjective complaints of pain was supported by substantial evidence. Accordingly, Plaintiff has failed to demonstrate that the ALJ erred.

## C.     New Evidence before the Appeals Council

Finally, the Plaintiff argues that the Appeals Council erroneously determined that newly submitted evidence[5] did not "show a reasonable basis that it would change the [ALJ's] decision."

Generally, a claimant may present new evidence at each stage of the administrative proceeding. *Ingram*, 496 F.3d at 1260-61. The Appeals Council is required to "consider new, material, and chronologically relevant evidence that the claimant submits" and "must review the case if the administrative law judge's actions, finding, or conclusion is contrary to the weight of the evidence currently of record." Evidence must both be non-cumulative and must "'relate[] to the period on or before the date' of the ALJ's decision." *Banks v. Comm'r, Soc. Sec. Admin.*, 686 F. App'x. 706, 709 (11th Cir. 2017) (quoting 20 C.F.R. § 416.1476(b)(1)) (defining chronologically relevant); *see Robinson v. Astrue*, 365 F. App'x. 993, 996 (11th Cir. 2010) (quoting *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987)) (noting that new evidence must be non-cumulative).

---

[5] Plaintiff submitted a Mental Impairment Questionnaire completed by Dr. Michael Vandewalle, D.O., and Judith Hussey, A.R.N.P.

New evidence is "material, and thus warrant a remand, if 'there is a reasonable possibility that the new evidence would change the administrative outcome.'" *Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x 735, 745 (11th Cir. 2011) (quoting *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987)). Federal courts must review *de novo* the Appeals Council's decision not to consider new evidence. *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1321 (11th Cir. 2015). If the Appeals Council erroneously refused to consider newly-submitted evidence, it committed legal error and remand is appropriate. *Id.* (citing *Farrell v. Astrue*, 692 F.3d 767, 771-72 (7th Cir. 2012); *Threet v. Barnhart*, 353 F.3d 1185, 1191-92 (10th Cir. 2003); *Bergmann v. Apfel*, 207 F.3d 1065, 1071 (8th Cir. 2000)).

"When a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether the new evidence renders the denial of benefits erroneous." *Id.* In other words, the pertinent inquiry is whether the Plaintiff has submitted "new, material, chronologically relevant evidence" to the Appeals Council that renders the decision of the ALJ "unsupported by substantial evidence." *Ingram,* 496 F.3d at 1261, 1266. Thus, this court must consider evidence submitted to the Appeals Council in conjunction with other evidence in the record to determine whether substantial evidence supports the ALJ's decision. *Ingram*, 496 F.3d at 1266.

Regarding Plaintiff's case, the evidence that the Plaintiff submitted to the Appeals Council does not appear to be chronologically relevant. Sometimes a

physician's evaluation may be relevant, even though it occurred after the date of the ALJ's decision. *See Washington*, 806 F.3d at 1323; *Boyd v. Heckler*, 704 F.2d 1207, 1211 (11th Cir. 1983) (considering a "treating physician' opinion" even though "he did not treat the claimant until after the relevant determination date"), *superseded on other grounds by statute*, 42 U.S.C. § 423(d)(5). To be relevant, however, such evidence must "relate back to the period before the ALJ's decision." *Washington*, 806 F.3d at 1322 (holding that a medical opinion based on treatment that occurred after the ALJ's decision was chronologically relevant because it was based on plaintiff's condition prior to the ALJ's decision and a review of medical records from the period before the ALJ's decision).

Here, Plaintiff's questionnaire was completed nine months after the ALJ's decision. While the form indicates that Plaintiff was a patient "since April 25, 2014," the questionnaire did not indicate whether Dr. Vandewalle and Nurse Hussey's opinions was based on their assessments of experiences that occurred during the relevant period or their review of medical records from a period prior to the ALJ's decision.[6] (Tr. 635-40). Even assuming that the opinion expressed in the

---

[6] In reaching this conclusion the undersigned notes that Dr. Vandewalle and Nurse Hussey indicated that Plaintiff has been a patient since April 2014. In addition, nine months elapsed between the ALJ's decision and the newly submitted evidence. (Tr. 635). The questionnaire that they completed did not direct the physician to base his decision on any period, so there is no way to know what period Dr. Vandewalle and Nurse Hussey considered.

questionnaire was temporally relevant, however, the undersigned finds that the Appeals Council did not err in refusing to consider the newly submitted evidence.

The Appeals Council found that the newly submitted evidence did not have a reasonable probability of altering the ALJ's determination that the Plaintiff was not disabled—i.e. it was not material.

At the hearing, the ALJ had Dr. Vandewalle and Nurse Hussey's treatment notes from the relevant period: April 2014 through February 2016. (Tr. 507-65). The ALJ discussed these notes in great detail when he rendered his decision. (Tr. 25-27). Thus, the ALJ had—at the time of the decision—Plaintiff's diagnoses, list of prescribed medications, evidence of Plaintiff's symptoms, and the mental health exam results from Dr. Vandewalle and Nurse Hussey. (Compare 507-65 with 635-36, 38). The ALJ also possessed notes from the Emerald Coast Behavioral Hospital regarding the Plaintiff's July 2015 hospitalization along with her relevant diagnoses, symptoms, and medications. (Tr. 568-82). Thus, the questionnaire does not contain objective findings that would undermine the ALJ's decision insofar as the ALJ

---

Furthermore, there is no indication whether Dr. Vandewalle and Nurse Hussey completed the questionnaire based solely on assessments that occurred *prior to* the ALJ's decision, or if their opinion was based on assessments of conditions that existed only during the nine months *after* the ALJ's decision.

Notably, the questionnaire provided Dr. Vandewalle and Nurse Hussey with an opportunity to explain their views, provide relevant treatment notes, and provide test results to support their conclusions. They elected not to provide any of this. (Tr. 635-40). Thus, Plaintiff has not established that the questionnaire relates to the relevant period considered by the ALJ.

already possessed and considered the relevant information, including from the "authors" of the information contained in the questionnaire. *See Robinson*, 365 F. App'x. at 996; *Milano*, 809 F.2d at 766 (noting that new evidence must be non-cumulative).

This court further notes that Dr. Vandewalle and Nurse Hussey's "opinion" was expressed in the questionnaire merely by checking blocks on a preprinted form. Not surprisingly, courts have held that medical opinions that are articulated simply be checking blocks on a preprinted form are not persuasive evidence. *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting that opinion of a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best"); *Hammersley v. Astrue*, No. 5:08cv245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions."). For this reason also, Plaintiff has not shown that such unpersuasive evidence would have made a difference in the ALJ's decision.

Furthermore, the questionnaire instructed the individual completing the form to explain any limitations and include the medical/clinical findings that support the

relevant assessments. Despite this explicit instruction, neither Dr. Vandewalle nor Nurse Hussey explained the limitations or included the medical/clinical findings that would support their assessment that Plaintiff's limitations were severe. (Tr. 635, 637, 638). Thus, even if this evidence had been presented to the ALJ, it is highly unlikely that the conclusory "check the block" opinions expressed therein would have changed the ALJ's opinion. The fact that Dr. Vandewalle and Nurse Hussey's opinion expressed in the "check the block" form was inconsistent with the rest of the evidence—including Dr. Vandewalle and Nurse Hussey's own treatment notes—further demonstrates that his evidence would not have affected the ALJ's decision.

Additionally, although "a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ." *Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923 (11th Cir. 2007) (citing 20 C.F.R. §§ 404.1515, 404.1527, 404.1545); *see also Chapo v. Astrue*, 682 F.3d 1285, 1288-89 (10th Cir. 2012) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question [and][w]e have thus 'rejected [the] argument that there must be specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category.'") (quoting *Howard v. Barnhart,* 379

F.3d 945, 949 (10th Cir. 2004)); *see also Carson v. Comm'r of Soc. Sec.*, 440 F. App'x 863, 864 (11th Cir. 2011) (upholding the ALJ's RFC determination because "the ALJ fully discussed and evaluated the medical evidence, [claimant's] testimony, and the effect each impairment had on [the claimant's] daily activities.").

Thus, even if Dr. Vandewalle and Nurse Hussey's "check the block" questionnaire has been submitted to the ALJ, an ALJ may discount even a treating physician's opinion if "good cause is shown to the contrary." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Good cause exists for discounting a treating physician's report "when it is not accompanied by objective medical evidence or is wholly conclusory." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (quoting *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)); *see Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) (finding that when a treating physician made merely conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

In his thorough discussion of Plaintiff's relevant mental health treatment, the ALJ noted that Dr. Vandewalle's treatment notes from his initial encounter with Plaintiff indicated that Plaintiff was alert and cooperative with clear, coherent and articulate speech. (Tr. 26, 556). Plaintiff's memory was intact, her insight and

judgment were fair, and she did not have any suicidal ideations. Dr. Vandewalle assessed the Plaintiff as having a Global Assessment of Functioning ("GAF") score of 55, which is indicative of only moderate symptoms. (Tr. 556); Am. Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. Text rev. 2000). The ALJ discussed subsequent mental status examination results, which showed similar findings. (Tr. 524, 527, 534-35, 540, 543, 546, 549, 551-52).

The ALJ also discussed and considered the objective medical records of other doctors and medical professionals who treated and examined the Plaintiff during the relevant period. These also indicated that that the Plaintiff's mental conditions were not as limiting as stated by Dr. Vandewalle and Nurse Hussey in the "check the block" questionnaire. For instance, the ALJ noted that when Plaintiff presented at Emerald Coast Behavioral Hospital, Dr. Yana Kirova-Pancheva, MD, was unable to elicit PTSD or general anxiety disorder symptoms. (Tr. 26, 580). Records from Emerald Coast Behavioral Hospital also reflected many of the same mental examination findings as Dr. Vandewalle. Namely, Plaintiff's memory—both recent and remote—appeared intact, her judgment was fair, and her insight was fair. (Tr. 569, 576, 578, 580).

Plaintiff's medical records also reflect that she was cooperative, fully oriented to person, place, time, and situation, and her thought process was logical and goal-directed. (Tr. 569, 576, 582). The ALJ also noted that examining consultant Joseph

Siano, D.O., observed that the Plaintiff's memory problems, anxiety, and depression appeared to pose no functional limitations. (Tr. 33, 505). The weight of the evidence, therefore, strongly supported the ALJ's findings, and remanding to require the ALJ to consider a "check the block" form that was contrary to the other evidence—including evidence from the very physician who completed the "check the block" form—would be pointless.

Finally, Plaintiff contends that the Appeals Council failed to make detailed findings of fact when it determined that Plaintiff's newly submitted evidence was not material. The Eleventh Circuit has squarely held that "there is no requirement that 'the Appeals Council . . . provide a detailed discussion of a claimant's new evidence when denying a request for review.'" *Parks ex. rel. D.P. v. Comm'r, Soc. Sec. Admin.*, 783 F.3d 847, 853 (11th Cir. 2015) (quoting *Mitchell v. Comm'r, Soc. Sec. Admin*, 771 F.3d 780, 783 (11th Cir. 2014)). There are, however, contexts where the Eleventh Circuit has found that a lack of a detailed explanation required remand based on the procedural history. *See Epps v. Harris*, 624 F.2d 1267, 1269, 1272-73 (5th Cir. 1980) (noting that the Appeal Council affirmed the ALJ decision without explaining or expanding on the ALJ's disability determination when the ALJ's decision was premised on claimant's lack of radical treatment and new evidence showed he had been referred for consideration of radical intervention); *Mann v. Gardner*, 380 F.2d 182, 185-87 (5th Cir. 1967) (Appeals Council adopted the

recommended decision and issued a decision explaining why the claimant was not entitled to a period of disability or disability insurance benefits without satisfactorily explaining why the new evidence was required); *Bowen v. Heckler*, 748 F.2d 629, 634-35 (11th Cir. 1984) (finding that Appeals Council erred in perfunctory adherence to ALJ's decision, which failed to consider the aggregate impact of claimant's impairments, because it did not apply correct legal).

Here, the Appeals Council indicated that it reviewed the new evidence, found that it was immaterial, and denied review. (Tr. 1-2). That was sufficient. Plaintiff has not cited any authority for her contention that the Appeals Council was required to make detailed findings of fact regarding immateriality, as she was directed by the court's order (Doc. 14 at 2), or that this case should be governed by *Epps*, *Mann* or *Bowen* rather than *Parks* and *Mitchell.*

## III.   Conclusion

The ALJ adhered to applicable legal standards and rendered a decision supported by substantial evidence. Accordingly, it is **ORDERED** that:

1.      The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

2.      **FINAL JUDGMENT** is entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.     The clerk of the court close the case file.

**SO ORDERED** this <u>29th</u> day of March 2019.

/s/ *Michael J. Frank*
_____

**Michael J. Frank**
**United States Magistrate Judge**